COPYING PROHIBITED HRS 606-13/HRCP RULE 30(f)(2)

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF HAWAII
 3                           ---:---

 4   DAWN COOPER,                  )  CIVIL NO. 03-00595 SPK/LEK
                                   )
 5                                 )
                  Plaintiff,       )
 6                                 )
           vs.                     )
 7                                 )
     KEVIN W. DIEFFENBACH, M.D.    )
 8   and DOES 1-10,                )
                                   )
 9                Defendants.      )
                                   )
10   _____)
                                   )
11   KEVIN W. DIEFFENBACH, M.D.,   )
                                   )
12        Third-Party Plaintiff,   )
                                   )
13         vs.                     )
                                   )
14   UNITED STATES OF AMERICA and  )
     DOE DEFENDANTS 1-10,          )
15                                 )
          Third-Party Defendants.  )
16   _____)

17

18

19                        **VOLUME I**

20           DEPOSITION OF F. DON PARSA, M.D.

21   Taken on behalf of the Plaintiff, at the Offices of F.

22   Don Parsa, M.D., 1329 Lusitana Street, Suite 807,

23   Honolulu, Hawaii, commencing at 12:16 p.m., on Friday,

24   May 6, 2005, pursuant to Notice.

25   BEFORE:      Cassie Uyekubo, CSR 293
                  Notary Public, State of Hawaii
```

CARNAZZO COURT-REPORTING CO., LTD., 532-0222

EXHIBIT B

1  not been negligent during either the surgery or the
2  follow-up care, is it your opinion that the
3  complications that Ms. Cooper suffered were caused both
4  by her history of smoking during five years and her
5  weight?
6  A    Yes.
7  Q    Are you able to weight those relatively; that is,
8  what percentage do you think the smoking history
9  contributed, and what percentage the weight history
10 contributed?
11 A    To some extent, yes.  There was a study done by
12 Deborah White from University of Virginia Health
13 Sciences Center approximately ten years ago -- I'm
14 sorry, it wasn't -- it was University of New Mexico,
15 Albuquerque -- in New Mexico.  And in that study, they
16 found that patients undergoing breast reduction of less
17 than 700 grams had 30-plus percent rate of delayed wound
18 healing and wound-healing problems, in contrast to those
19 who had more than 1000 grams removed, who had a hundred
20 percent problems with wound-healing.
21      So, this lady fell right in between.
22      So, I would say her risk of wound-healing problem,
23 would have fallen somewhere fifty-fifty.  Not that I
24 would have refused to operate on her, but she was taking
25 a major risk.

1  appear in American Physician, Journal of American
2  Physician, the name of the article, I estimate, The
3  American Physician.  And it showed very clearly that if
4  you remove less than 700 grams, there is 30-plus risk.
5  I don't remember what that "plus" was -- maybe
6  35 percent, 35 percent increased risk of wound-healing
7  problems.
8      And if it was over a thousand grams, then it would
9  be a hundred percent.  So, you guarantee that smokers
10 will have wound problems, if you are removing that much
11 breast tissue.
12     Therefore, the bigger the patient, you remove more
13 breast tissue; therefore, the higher the incidence.
14     To tie these two together is extraordinarily hard,
15 because you have to have a very, very, very large cohort
16 of patients -- thousands even, and have them
17 categorized, and have them operated by the same
18 surgeon -- that's my bias -- the same technique, the
19 same environment, with no other co-morbidities.
20     Now, you're adding a co-morbidity factor into the
21 equation -- not smoking.
22 Q   Just asking you to hold the thought for a minute.
23     This study, did that involve oncological
24 surgeries, or simple breast reductions?
25 A   Simple aesthetic breast reductions.

1   A    It would be conjecture, it would be pure
2   assumption. I would say, in my experience, based on my
3   experience, my intuition -- my intuition, I would say
4   30 percent would be --
5   Q    -- Excuse me. Separate intuition and experience.
6   A    My observations -- let's say, not really my
7   experience -- by my observations, based on patients I've
8   seen in the hospital, I've been sitting on Peer Review
9   Committees for many years, and I've seen obese patients
10  present complications; smokers present complications.
11       I would say 30 percent obesity, 70 percent
12  smoking.
13  Q    Now, I note in your letter, in your opinion
14  letter, you say nothing about the weight factor.
15       You just don't mention it.
16  A    Right.
17  Q    Was that an oversight? Because you've told us
18  here today that her weight was a factor.
19  A    I would say it was an oversight.
20  Q    All right. So, will you take Exhibit 1, please?
21       How should we amend your opinion letter of April
22  7th to reflect this oversight, doctor?
23       What should we add?
24  A    I focused primarily on smoking, and I would add
25  obesity to that -- that primarily, smoking, and

1   secondarily, obesity may have contributed or even caused
2   this patient's complications.
3   Q    So, that primarily smoking?
4   A    Yes, and secondarily, obesity.
5        Again, I have to qualify the term "obesity"
6   because I'm not referring to any chart, because the
7   charts define overweightness to obesity.  So, she may
8   not be obese, but she may be overweight.
9        If you give me 5 minutes, I can go and check.
10  Q    We can do it during the next break, if you like.
11  If you want to do it now, either way.
12  A    So, 5 feet 5 inches --
13              MR. PORTNOY:  218.
14       (Recess from 1:54 to 1:55 p.m.)
15              THE WITNESS:  The patient is obese.
16  Q    (By Mr. Edmunds) What was the weight?
17  A    218.
18  Q    No, below what weight would she be not obese, do
19  you recall?  That's all right.  She's within the zone
20  for obesity?
21  A    She's in the obese range.
22  Q    So, Paragraph 4 in Exhibit 1 of your April 7, 2005
23  letter should now be amended now to read, "It is well
24  known that smoking does adversely affect the outcome in
25  patients undergoing such operations, and it is likely

```
 1   that primarily smoking, and secondarily, her obesity,
 2   may have contributed or even caused this patient's
 3   complications."
 4        Are those your words?  I don't want to put words
 5   in your mouth.  I thought that's what you said, but
 6   let's get it in your language.
 7   A    That primarily smoking, and to some extent,
 8   obesity.
 9   Q    Fair enough.  To some extent, her obesity --
10   A    Yes.
11   Q    -- may have contributed or even caused this
12   patient's complications?
13   A    And perhaps to some extent, her obesity.
14   Q    All right.  When you say, "perhaps to some extent"
15   you are familiar generally with the phrase "reasonably
16   medically probable", correct?
17   A    Yes.
18   Q    In your opinion, to a reasonable medical
19   probability, did her obesity to some extent cause or
20   contribute to these wound-healing complications?
21   A    Yes.
22   Q    Now, in the next sentence in the letter, you did
23   write, you said, "However, such complications could also
24   occur in non-smokers."  Correct?
25   A    Yes.
```

1  smokers people who are at risk for increased fat
2  necrosis during reduction mammoplasty?
3  A    No, there is no study available.
4       He based his opinion -- I doubt he based it on
5  scientific data.  That is not data-science-based
6  opinion, in my opinion.  If it is, then he should have
7  it in his reference.  He would have a Reference Number
8  5, and he would give it at the end of his text.
9       And he does not, I believe -- my recollection is,
10 he doesn't.  So, if you find that, then I would be more
11 than happy to consider that as a very -- at least based
12 on certain science.
13      Otherwise, it's just an opinion.
14 Q    I move to strike your answer is non-responsive.
15      My question was whether smokers who have reduction
16 mammoplasty who have large, ptotic breasts with
17 questionable parenchymal blood flow -- strike that.  I'm
18 sorry.
19      Are females seeking reduction mammoplasty who have
20 large and ptotic breasts at risk of questionable
21 parenchymal blood flow and increased risk of fat
22 necrosis if they are smokers?
23 A    Yes, I agree.  I agree.
24 Q    And in that situation, is the inferior central
25 pedicle surgery safer for them than the central pedicle

1  available, had he wished to use them, correct?
2  A    That's very correct.
3  Q    And as I understand it, you're not -- you don't
4  take any position as to whether Dawn Cooper said, I
5  don't need to preserve the lactation function or not --
6  you don't take any stand on that, correct?
7  A    That is correct.
8  Q    So, if she testified that wasn't important to her,
9  you would accept that, correct?
10 A    I would.
11 Q    Now, as between all the choices that were
12 available to Dr. Dieffenbach as to which choice of
13 surgery to pick, were there any that were safer, given
14 Dawn's history as you understood it from the records --
15 any that were safer, by any margin, than the central
16 pedicle technique?
17 A    I believe what was selected is as safe as any
18 other technique, perhaps with the exception of the
19 procedures I mentioned to you involving excision of
20 large portion of the breast, inferiorly and medially,
21 with a free NAC graft.
22 Q    And that would have been safer?
23 A    That is considered ultra-safe because no -- no
24 flaps are elevated.
25 Q    And it is in the elevation of the flaps that the

```
 1   greater risk to the interruption of the blood supply is
 2   encountered; is that correct?
 3   A    Absolutely.
 4   Q    On a comparative basis, what was the percentage of
 5   risk of fat necrosis and wound healing using the
 6   technique you just described, compared to the central
 7   pedicle technique that Dr. Dieffenbach used?
 8   A    Studies have not been done because that technique,
 9   which involves amputation, basically, with free
10   nipple-areolar graft, they are done in very large
11   breasts -- gigantomastia -- patients who require removal
12   of breast tissues in the order of 1500 to 2000 grams
13   from each side, who are extremely pendulous, who are --
14   perhaps have other risk factors, and in whom one wishes
15   to shorten the operative period, as well as reduce any
16   morbidity.
17   Q    Are you saying it was not an indicated procedure
18   here?
19   A    Because she was young.
20   Q    Because of her youth?
21   A    Yes.
22   Q    Were there any other safer procedures than the
23   central pedicle technique?
24   A    Not safer, but other alternatives.
25        I, personally -- the photographs I saw -- I,
```

```
 1   risks that should be disclosed before the surgery.
 2             MR. PORTNOY:  That's fine.
 3   Q    (By Mr. Edmunds) All right.  So at the time frame
 4   that's before the surgery, when you're coming in and
 5   saying, here's what a reasonable surgeon would or
 6   wouldn't, or should or shouldn't have done, you're
 7   saying, material risks should be disclosed.
 8        Now you want "material" defined, okay?
 9        And I'm saying, you've focused on there only being
10   two possible risk factors here, as we're going into the
11   surgery.
12        Later, more may have been identified or thought
13   about.  But as a doctor goes in, I was impressed by what
14   you said -- that nobody would think of anatomical
15   anomaly.  So, it's down to just two -- smoking and
16   weight.  It sounds as if you would agree that the weight
17   risk factor is an important factor.
18        How about the word "important" is it an important
19   factor?
20   A    Yes.
21   Q    All right.  If it's an important risk factor, do
22   you think that surgeons should disclose to their
23   patients important risk factors, don't you?
24   A    Yes.
25   Q    All right.  And an important risk factor like this
```

```
 1   one should have been disclosed?
 2                MR. PORTNOY:  Like "this one" -- weight?
 3                MR. EDMUNDS:  Weight.
 4                MR. PORTNOY:  I don't want the record to
 5   be any more unclear than it is.
 6                MR. EDMUNDS:  Oh, I don't think the
 7   record is unclear at all.
 8   BY MR. EDMUNDS
 9   Q     It was an important risk factor, correct?
10   A     Yes.
11   Q     Surgeons should disclose to their patients
12   important risk factors before surgery, correct?
13   A     Correct.
14   Q     And a surgeon who meets the standard of care for
15   disclosure would, therefore, have disclosed weight as a
16   risk factor to Ms. Cooper before operating, correct?
17         Yes or no?
18   A     Yes.
19   Q     Thank you.  Now, smoking is also an important risk
20   factor in Ms. Cooper's case, correct?
21   A     Yes.
22   Q     And her history of smoking was an important risk
23   factor before the surgery?
24   A     Right.
25   Q     And important risk factors should be disclosed by
```

1  the surgeon to the patient before operating?
2  A    Correct.
3  Q    And the risk factor of smoking should have been
4  disclosed to Ms. Cooper before he operated, correct?
5  A    Yes.
6  Q    So, if Dr. Dieffenbach did not disclose those two
7  risk factors of weight and smoking as factors before he
8  operated, if he didn't, under the facts and
9  circumstances as you know them to be, he violated the
10 applicable standard of care?
11 A    Right.
12            MR. EDMUNDS:  Thank you.  It's ten of
13 5:00.  I'm not going to finish today.  I understand the
14 doctor has to be somewhere, and we might as well wrap at
15 this point.  I bought five hours of time today, I'll pay
16 for them.
17            MR. PORTNOY:  Yeah, of course.  We'll
18 just let it rest here.
19            MR. EDMUNDS:  Thank you.  We'll
20 reschedule.
21            MR. PORTNOY:  We'll deal with whether
22 and how we go forward.
23            (The deposition adjourned at 4:53 p.m.)
24
25

```
 1   STATE OF HAWAII              )
                                  )SS.
 2                                )

 3

 4        I, CASSIE UYEKUBO, C.S.R., a Notary Public in and
     for the State of Hawaii, do hereby certify:
 5

 6        That on May 6, 2005, appeared before me F. DON
     PARSA, M.D., the witness whose testimony is contained
 7   herein, that prior to being examined, the witness was by
     me duly sworn or affirmed; that the proceedings were
 8   taken in computerized machine shorthand by me and were
     thereafter reduced to print under my supervision; that
 9   the foregoing represents, to the best of my ability, a
     correct transcript of the proceedings had in the
10   foregoing matter;

11
          That the witness, if applicable, was notified
12   through counsel, by mail or by telephone to appear and
     sign; that if the transcript is not signed, either the
13   reading and signing were waived by the witness and all
     parties, or the witness has failed to appear and the
14   original is therefore kept on file without signature
     pursuant to Court rules.
15

16        I further certify that I am not counsel for any of
     the parties hereto, nor in any way interested in the
17   outcome of the cause named in the caption.

18

19

20      Dated: _____

21

22                  _____
                    Cassie Uyekubo, C.S.R. #293
23                  Notary Public, State of Hawaii
                    My Commission Expires: November 8, 2005
24

25
```