EDMUNDS & VERGA
Attorneys at Law, A Law Corporation

JOHN S. EDMUNDS        734-0
jedmunds@ev-law.com
RONALD J. VERGA      2638-0
rverga@ev-law.com
JOY S. OMONAKA        5709-0
jomonaka@ev-law.com
841 Bishop Street, Suite 2104
Honolulu, Hawai`i 96813
Telephone:  (808) 524-2000
Facsimile:  (808) 528-3585

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DAWN COOPER, | ) | CIVIL NO. 03-00595 SPK/LEK |
| | ) | |
| Plaintiff, | ) | PLAINTIFF DAWN COOPER'S |
| | ) | MEMORANDUM IN OPPOSITION |
| vs. | ) | TO DEFENDANT KEVIN W. |
| | ) | DIEFFENBACH, M.D.'S MOTION |
| KEVIN W. DIEFFENBACH, M.D. and | ) | FOR SUMMARY JUDGMENT ON |
| DOES 1-10, | ) | PLAINTIFF'S FIRST AMENDED |
| | ) | COMPLAINT FILED OCTOBER 18, |
| Defendants. | ) | 2005 FILED MARCH 13, 2007; |
| | ) | AND CERTIFICATE OF SERVICE |
| | ) | |
| | ) | HEARING: |
| | ) | Date:   May 23, 2007 |
| | ) | Time:   10:00 a.m. |
| | ) | Judge:  Hon. Samuel P. King |
| | ) | |
| | ) | TRIAL DATE:  No Trial Date |
| | ) | |

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTORY SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    Hawaii's Informed Consent Law . . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Defendant's Testimony Provides the Requisite Foundation for Expert
            Testimony Regarding Materiality Under the Patient Oriented
            Standard For Informed Consent Claims . . . . . . . . . . . . . . . . . . . . . . 7

      C.    Defendant Has Failed to Demonstrate an Absence of Genuine Issues
            of Fact on Plaintiff's Informed Consent Claim . . . . . . . . . . . . . . . . 15

            1.    Defendant Owed a Duty to Disclose the Risk of One or More
                  of the Collateral Injuries That Plaintiff Suffered . . . . . . . . . . 15

            2.    Defendant Breached His Duty to Disclose . . . . . . . . . . . . . . . 16

            3.    Plaintiff Suffered Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            4.a.  Defendant's  Breach of Duty Proximately Caused Plaintiff's
                  Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            4.b.  Defendant's Breach of Duty Was a Proximate Cause of
                  Plaintiff's Injury in That a Reasonable Person in the Plaintiff's
                  Position Would Not Have Consented to the Treatment That Led
                  to the Injuries Had She Been Properly Informed . . . . . . . . . . 20

i

5.  There Is No Other Superseding Cause of Plaintiff's Injury . . 22

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

PAGE

<u>CASES</u>

<u>Bernard v. Char</u>, 79 Hawai'i 362, 903 P.2d 667 (1995) . . . . . . . . . . . . . . . . . . . . . 6

<u>Carr v. Strode</u>, 79 Hawai'i 475, 904 P.2d 489 (1995) . . . . . . . . . . . . . . . 5, 6, 20, 21

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 106 S. Ct. 2548,
      91 L. Ed. 2nd 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Keiter v. Penn Mutual Insurance Co.</u>, 900 F. Supp. 1339 (D. Haw. 1995) . . . . . . 5

<u>State Farm Fire & Casualty Co. v. Martin</u>, 872 F.2d 319 (9th Cir. 1989) . . . . . . . 5

<u>T.W. Electrical v. Pacific Electric</u>, 809 F.2d 626 (9th Cir. 1987)
      (citing <u>Anderson v. Liberty Lobby</u>) 106 S.Ct. 2505 (1986) . . . . . . . . . . . . 4

<u>STATUTES AND RULES</u>

Federal Rules of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Federal Rules of Civil Procedure 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Federal Rules of Civil Procedure 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PLAINTIFF DAWN COOPER'S MEMORANDUM IN OPPOSITION
TO DEFENDANT KEVIN W. DIEFFENBACH, M.D.'S MOTION FOR
SUMMARY JUDGMENT ON PLAINTIFF'S FIRST AMENDED
COMPLAINT FILED OCTOBER 18, 2005 FILED MARCH 13, 2007

Plaintiff Dawn Cooper ("Plaintiff") opposes Defendant Kevin W.

Dieffenbach, M.D.'s Motion For Summary Judgment on Plaintiff's First Amended

Complaint Filed October 18, 2005 (filed on March 13, 2007) ("Motion") for the

reasons set forth below.

I.    INTRODUCTORY SUMMARY

Plaintiff's claim for lack of informed consent is based on the acts and

omissions of Defendant Kevin W. Dieffenbach, M.D. ("Defendant") when he

performed a surgical breast reduction procedure on Plaintiff on July 16, 2001

("surgery").  Although Plaintiff originally also alleged Dr. Dieffenbach negligently

performed the surgery in question, Plaintiff has since advised opposing counsel

and Magistrate-Judge Leslie Kobayashi that Plaintiff was withdrawing those

claims (set forth in the first and second causes of action in her First Amended

Complaint[1]).

---

[1]  Plaintiff advised the Court of her inability to secure an expert witness to
testify that Defendant's performance of the surgery itself fell below the applicable
standard of care in her Confidential Settlement Conference Statement filed on
June 6, 2006.  Plaintiff's counsel also informally so advised defense counsel. This
obviously eliminated Plaintiff's claims for negligence and gross negligence.
Plaintiff then notified Defendant that the only remaining claim at issue was her
claim based on lack of informed consent.  See. Plaintiff's Pretrial Statement filed

In his Motion, Defendant claims that Plaintiff failed to present expert testimony to support her claims.  However, Plaintiff elicited ample testimony from Defendant himself on his failure to provide Plaintiff with sufficient information based on which she could have given an informed consent to the surgery.  That very testimony, coupled with Plaintiff's deposition testimony, is sufficient to more than meet Plaintiff's  burden of setting forth specific facts showing there are genuine issues of material fact which must be resolve at trial.

As set forth in more detail below, during Defendant's first deposition, he explicitly stated that obesity and smoking or a history of smoking were relevant risk factors.  Deposition transcript of Kevin W. Dieffenbach, M.D. taken on October 12, 2004 ("Defendant's 10/12/04 Deposition"), a true and correct copy of the excerpts of which are attached as Exhibit A to Plaintiff Dawn Cooper's Separate and Concise Statement of Material Facts in Opposition to Defendant Kevin W. Dieffenbach, M.D.'s Motion for Summary Judgment on Plaintiff's First Amended Complaint Filed October 18, 2005 Filed March 13, 2007 ("Plaintiff's Concise Statement").  In Defendant's continued deposition, he further testified that Plaintiff's obesity and history of smoking reasonably medically probably

---

herein on January 23, 2007, where Plaintiff's disputed issues and points of law deal solely with her claim of lack of informed consent.

2

caused the conditions currently suffered by Plaintiff as a result of the surgery.
Deposition transcript of Kevin W. Dieffenbach, M.D. taken on October 28, 2004
("Defendant's 10/28/04 Deposition"), a true and correct copy of the excerpts of
which are attached as Exhibit B to Plaintiff's Concise Statement.

Plaintiff, on the other hand, testified that she was never told of these
relevant risk factors and would not have undergone the surgery if she known of
the risks and that the surgery performed would cause the results which it did.
Deposition of Dawn Cooper taken on December 15, 2004 ("Plaintiff's
Deposition") at pp. 93-94, a true and correct copy of the excerpts of which are
attached as Exhibit C to Plaintiff's Concise Statement.

Defendant's motion should be denied because: (1) although Plaintiff
may not have retained her own expert witness on the issue of lack of informed
consent, under the applicable Hawai'i state court case law, she is permitted to use
the evidence provided by Defendant to substantiate her claim that Defendant failed
to make sufficient disclosure of the risks in question; (2) Defendant's testimony
regarding the materiality of such risks provides the requisite foundation supporting
Plaintiff's breach of informed consent claim; and (3) Defendant has failed to show
that there are no genuine issues of material fact on the issue of informed consent

3

and is therefore not entitled to judgment as a matter of law on each and every

claim set forth in Plaintiff's First Amended Complaint.

## II.    LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as

to any material fact and the moving party is entitled to judgment as a matter of

law.  Federal Rules of Civil Procedure ("FRCP") Rule 56(c).  The moving party

has the initial burden of "identifying for the court those portions of the materials

on file in the case that it believes demonstrate the absence of any genuine issue of

material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553,

91 L. Ed. 2nd 265 (1986).  A material fact is one that pertains to an element of a

claim or defense and the existence of which might affect the outcome of the case.

The materiality of a fact is thus determined by the substantive law governing the

case.  T.W. Electrical v. Pacific Electric, 809 F.2d 626, 630 (9th Cir. 1987) (citing

Anderson v. Liberty Lobby) 106 S.Ct. 2505, 2510 (1986).

Once Defendant demonstrates the portions of the materials on file that

he believes demonstrate the absence of any genuine issue of material fact, Rule

56(e) requires that Plaintiff set forth, by affidavit or as otherwise provided in Rule

56, specific facts showing that there is a genuine issue for trial.  Id.  In deciding a

motion for summary judgment, the court must view the facts in the light most

favorable to the non-moving party.  State Farm Fire & Casualty Co. v. Martin, 872

F.2d 319, 320 (9th Cir. 1989); Keiter v. Penn Mutual Insurance Co., 900 F. Supp.

1339 (D. Haw. 1995).

III.    ARGUMENT

Defendant argues that Plaintiff has failed to produce testimony or any

evidence on her claims for 1) breach of the applicable standard of care in the form

of negligence or gross negligence; and 2) lack of informed consent.  As stated

above, Plaintiff has withdrawn her claims for negligence and gross negligence, but

proceeds herein on her claim for lack of informed consent.  Plaintiff does not have

her own expert witness to substantiate her claim for lack of informed consent,

however, the requisite evidence can be adduced through deposition testimony of

Defendant.

A.    Hawaii's Informed Consent Law

A physician has a duty to his patient to disclose all relevant

information concerning a proposed treatment.  Carr v. Strode, 79 Hawai'i 475,

479, 904 P.2d 489, 493 (1995).  In order to establish a claim of negligent failure to

obtain informed consent, Plaintiff must demonstrate the following:

> (1)    the physician owed a duty to disclose the risk of one or more of
> the collateral injuries that the patient suffered;

(2)    the physician breached that duty;

(3)    the patient suffered injury;

(4)    the physician's breach of duty was a cause of the patient's injury in that

    (a)    the physician's treatment was a substantial factor in bringing about the patient's injury and

    (b)    a reasonable person in the plaintiff patient's position would not have consented to the treatment that led to the injuries had the plaintiff patient been properly informed; and

(5)    no other cause is a superseding cause of the patient's injury.

Bernard v. Char, 79 Hawai'i 362, 365, 371, 903 P.2d 667, 670, 676 (1995).

The Hawai'i courts have adopted the patient oriented standard which requires a physician to disclose "what a reasonable patient needs to hear from his or her physician in order to make an informed and intelligent decision regarding treatment. ..." Carr, supra, 79 Hawai'i at 480, 484-485.  The Carr court explained the need for expert medical evidence under this standard:

> ... a plaintiff is not required to prove the standard of disclosure required for informed consent with medical expert evidence, but is required to prove by expert medical evidence the materiality of the risk of harm to which the plaintiff was subjected.  It is clear that a

6

<u>defendant-physician's testimony may satisfy this burden ....</u>

<u>Id</u>. at 487 (emphasis added).

  B. <u>Defendant's Testimony Provides the Requisite Foundation for Expert Testimony Regarding Materiality Under the Patient Oriented Standard For Informed Consent Claims</u>

  Defendant testified extensively in deposition as to the materiality of the risks.  Specifically, he admitted that Plaintiff's weight was a relevant risk factor for any surgical procedure when he testified as follows:

   Q Is there any other reason why you would recommend someone lose weight in lieu of, or in the alternative to, performing the surgery?

   A Yes.  <u>Obesity is, in and of itself, a risk factor for any surgical procedure</u>.

Exhibit A at p. 19 (emphasis added).

   Q. <u>Because Ms. Cooper had the history of obesity and weight fluctuation, that she was at greater risk for post-surgical complications in the surgery you performed than a patient would have been, who didn't have that history</u>?

   A <u>Yes</u>.

Exhibit B at p. 108 (emphasis added).

  Defendant went on to admit that smoking, or a history of smoking, is relevant for a patient undergoing the surgery:

7

Q    Now, did she give you a history of being a
     smoker?

A    Yes, she did.

Q    And that is a significant history in a candidate for
     this kind of surgery, is it not?

A    It is relevant, yes.

Q    And why is that?

                    *       *       *

A    Generally, smoking increases risk of virtually any
     surgery.

Q    And the general nature of the increased risk for
     this type of surgery is that the smoking causes
     constriction of the blood vessels, correct?

A    That's certainly one factor.

Q    And ... if someone is smoking right up to the time
     of the surgery and resumes smoking right after ...
     the constriction of the blood vessels can inhibit the
     blood flow and the healing process; is that correct?

A    Correct.

                    *       *       *

Q    So in addition to the vessel constriction which
     results from someone smoking tobacco or
     cigarettes, your understanding is that there is, in
     addition, an interference with wound healing by
     virtue of someone being a smoker?

8

> A      Or a history of smoking.

<u>See</u> Exhibit A at pp. 20-21 (emphasis added).

Defendant's testimony clearly states that weight and a history of smoking were material and increased the risk of harm to Plaintiff.  Despite the materiality of these risk factors, Defendant could not recall specifically what he told Plaintiff.  Defendant claimed that he generally informed her of these two risk factors as follows:

> Q      Did you tell Dawn that because of her history of obesity and weight fluctuation, that she was at greater risk for post-surgical complications of any sort than someone who had not had that history?
>
> A      I don't specifically recall.

<u>See</u> Exhibit B at p. 109.

> Q      But on the occasion of the first office visit ... do you recall saying anything to her about smoking or not smoking?
>
> A      Yes.  When the issue comes up, I always say that that's an important aspect of surgical treatment, and that it's very important that she refrain from smoking.
>
> Q      Now, at that time, do you recall whether you said anything more than that?  That is, to give her the reasons why, or did you just state the conclusion?

9

A    I don't recall specifically.

Exhibit A at pp. 23-24.

As a result of the surgery, Plaintiff suffered from severe fat necrosis resulting in the surgical removal of substantial amounts of breast tissue.  See Operative Report dated August 30, 2001 ("Operative Report"), Exhibit A to the Deposition transcript of Thomas G. Crabtree, M.D. taken on April 14, 2005, a true and correct copy of which is attached as Exhibit D to Plaintiff's Concise Statement.  Despite Defendant's vague recollection of generally informing Plaintiff of the increased risks due to her obesity and history of smoking, Plaintiff, on the other hand, testified that Defendant did not discuss the risks of necrosis:

Q.    Did he talk to you about the possibility of you
       having any kind of a dead tissue that may occur?

A.    No.

Q.    Did he talk to you about the word necrosis, did
       that come up?

A.    No.

Q.    Do you know what necrosis is?

A.    Now I do.

Q.    Before the surgery, did you know?

A.    No.

10

Q.    Did you ever hear the word before the surgery?

A.    No.

Exhibit C at p. 72.

Plaintiff was also not informed of the risk of losing breast tissue.

Q.    Is there a risk or complication that you believe, now that you've gone through this, that was not discussed and you believe should have been discussed?

A.    Yes.

Q.    What are those or is that?

A.    The risk of breast tissue, not just breast skin or nipple, the complete and utter loss of breast tissue.

Q.    As distinct from skin and nipple?  I just want to make sure I understand your understanding.

A.    Correct.

Q.    Now, when you say the risk of loss of breast tissue?

A.     Correct.

Q.    And what do you now understand that risk to have been, based upon what occurred?  Well, in your own words, what is it that you think was a risk regarding the loss of breast tissue that should have been disclosed?

11

A.    I believe that it should have been disclosed if there is any kind of disruption, that your breast can die from the inside out.

Q.    And you had no such discussions about that.

A.    No.

Q.    Do you have an understanding of what, in your own words, caused the loss of breast issue?

A.    Not enough blood supply to the tissue.

See Exhibit C at pp. 89-90.

A.    But, to me, delayed healing would have to do with scarring.

Q.    Okay.  But you see the paragraph as written: "Wound disruption or delayed wound healing is possible.  Some areas of the breast skin or nipple region may not heal normally and may take a long time to heal.  It is even possible to have loss of skin or nipple tissue."

You understood that as a possible consequence of the surgery at the time?

A.    My superficial skin, yes, and the wounds on the outside where the incisions were made, correct, and I was told that if there was any delayed in those areas, that I could end up having to have further scar revision surgeries.

Q.    Where does the delayed healing paragraph talk about superficial wound, where did that word come from?

12

> A.    Because it says breast skin.  The skin is on the top,
> the skin isn't underneath.
>
> Q.    Did you discuss that paragraph with Dr.
> Dieffenbach?
>
> A.    No.
>
> Q.    And the "covered through TRICARE," you don't
> know whether you were dealing with possible scar
> revision or the issues discussed in delayed healing.
>
> A.    I believe that scar healing is part of delayed
> healing because your skin is the only thing that's
> going to scar.

See Exhibit C at pp. 81-83.

Moreover, when Plaintiff specifically questioned Defendant about the

effect her smoking history would have on skin loss and healing complications, he

advised Plaintiff that because she had stopped smoking it would not be an issue.

> Q.    You have a question mark next to "Smokers have
> a greater risk of skin loss."  Is that your question
> mark?
>
> A.    Correct.
>
> Q.    Why did you put that question mark there?
>
> A.    Because I wanted to ask him if I was a prior
> smoker, which is my handwriting next to that.
>
> Q.    Did you discuss that with him?

13

A.  Correct.

Q.  Hadn't you discussed that with him the very first time you met?

A.  Correct.

Q.  Why was it necessary for you to discuss it with him again?

A.  Because I was making sure that everything was going to be okay.

Q.  And what did you discuss with him about smokers have a greater risk of skin loss and wound healing complications?

A.  I asked him if being a prior smoker also would cause those complications, and he told me, no, that I'd quit smoking long enough for it not to be an issue.

Q.  And you had told him you had quit smoking at least four months before.

A.  Correct.

See Exhibit C at pp. 83-84.

Q.  Other than the scarring, did you have a discussion about delayed healing?

A.  No.

Q.  What about the superficial tissue you talked about earlier?

14

A.    Yes.

Q.    Did he explain to you that smokers have a greater
risk of skin loss and wound healing
complications?

A.    Correct.

Q.    But he told you if you stopped four months earlier,
no problem.

A.    Correct.

<u>See</u> Exhibit C at pp. 86-87.

Based on the vagueness of Defendant's testimony coupled with the
testimony given by Plaintiff, it is clear that genuine issues of material fact exist for
trial.

C.    <u>Defendant Has Failed to Demonstrate an Absence of Genuine Issues
of Fact on Plaintiff's Informed Consent Claim</u>

As set forth above, Plaintiff can certainly demonstrate that she is able
to provide sufficient evidence to satisfy all elements of her informed consent
claim.

1.    <u>Defendant Owed a Duty to Disclose the Risk of One or More
of the Collateral Injuries That Plaintiff Suffered</u>

Defendant, as Plaintiff's surgeon, owed her a duty to disclose the
risks of one or more of the collateral injuries that Plaintiff suffered, namely fat

15

necrosis and extensive loss of breast tissue.  Based on his own expert opinion set

forth in detail above, Defendant admitted that obesity and a history of smoking

were relevant risk factors which increased Plaintiff's risks and these same risk

factors reasonably medically probably caused the complications and injuries

suffered by Plaintiff.  He testified in relevant part as follows:

> Q.    What do you think reasonably medically probably
>       caused the unusual conditions we see in those
>       photographs?
>
> A     Her pre-existing conditions in regards to obesity
>       and significant weight changes; her history of
>       smoking; and what may or may not have happened
>       between the last time I saw her on the 10th and the
>       25th.

See Exhibit B at pp. 80-81.[2]

> Q     ... With that assumption, do you have an opinion
>       as to what reasonably medically probably caused
>       the conditions that Dawn presented with, four
>       weeks post-operatively ... .
>
> A     Well, again, most if not all of the things that I
>       mentioned before, her history of smoking and the
>       possibility that she resumed smoking.

---

[2]  For the Court's reference, certain of those photographs mentioned in
Defendant's deposition were attached as Exhibit A to Plaintiff's Notice of Appeal
to the District Court Pursuant to L.R. Rule 74.1 From the Order of Magistrate-
Judge Kobayashi Denying Plaintiff's Motion Re Use of Defense Expert's
Testimony on Informed Consent, filed under seal on October 27, 2006.

Her obesity, and significant weight changes.

See Exhibit B at p. 95.

> Q    ... Assume that she had not smoked three months
> prior to surgery, and did not smoke at any time
> within that three months prior to surgery, and did
> not smoke after the surgery you performed.  Do
> you believe that her history of smoking more than
> three months prior to surgery would have
> pre-disposed her for complications that she
> suffered?
>
> A    Yes, it's possible.
>
> Q    Reasonably medically probable, doctor?
>
> A    As a contributing factor, yes.

See Exhibit B at p. 98.

### 2.    Defendant Breached His Duty to Disclose

As set forth verbatim above, Defendant testified that during his first visit with Plaintiff, he informed Plaintiff, as he does when the issue of smoking or not smoking arises with his patients, that it is "an important aspect of surgical treatment" and that "it's very important that she refrain from smoking" but he could not "recall specifically" the information he provided.  Exhibit A at pp. 23-24.  Moreover, he could not "specifically recall" if he told Plaintiff that she was at

17

greater risk for post-surgical complications because of her history of obesity and weight fluctuation.  Exhibit B at p. 109.

Plaintiff testified, however, that Defendant did not discuss the risks of necrosis.  Exhibit C at p. 72.  Nor did he discuss the risk of "complete and utter loss of breast tissue" as compared to just breast skin and the fact that her breast could "die from the inside out."  Exhibit C at pp. 89-90.  In addition, although Plaintiff understood that there was a risk of wound disruption or delayed wound healing, she believed that this referred to her "superficial skin" with the possibility of "further scar revision surgeries" because she understood that her "skin is the only thing that's going to scar."  Exhibit C at pp. 81-83.  When Plaintiff specifically questioned Defendant about the effect her smoking history would have on skin loss and healing complications, Defendant advised Plaintiff that because she had stopped smoking, it would pose no problem for her.  Exhibit C at pp. 83-84 and 86-87.

In viewing the facts in the light most favorable to Plaintiff, there is a genuine issue of material fact as to what was disclosed to Plaintiff and whether or not Defendant breached his duty to disclose.

### 3.    Plaintiff Suffered Injury

There is no doubt that Plaintiff suffered horrific injuries as a direct and proximate result of the surgery performed by Defendant.  The fat necrosis progressed to the point where surgical intervention was necessary to remove necrotic tissue of open wounds on Plaintiff's breasts.  See Exhibit D.

### 4.a.    Defendant's  Breach of Duty Proximately Caused Plaintiff's Injury

After Defendant failed to properly disclose all material risks of the the surgery he performed on Plaintiff's breasts, that surgery was obviously a substantial factor, indeed, the sole fact, which caused Plaintiff's injuries and damages.  See Operative Report dated July 16, 2001, Exhibit 2 to Defendant's 10/12/04 Deposition at 17-18, a true and correct copy of which is attached as Exhibit E to Plaintiff's Concise Statement.

Initially, Defendant filed a Third-Party Complaint against Plaintiff's subsequent treating plastic surgeon, Thomas G. Crabtree, M.D.  See Defendant/Third-Party Plaintiff Kevin W. Dieffenbach, M.D.'s First Amended Third-Party Complaint; Exhibit "A"; Summons; Certificate of Service filed in the Circuit Court of the First Circuit, State of Hawaii on October 10, 2003, a true and correct copy of which is attached as Exhibit F to Plaintiff's Concise Statement.

Defendant alleged that Plaintiff's injuries and/or damages were proximately caused, in whole or in part, by the negligence, recklessness, and/or gross negligence of Dr. Crabtree.  Id at p. 3.  Once the case was removed to this Court, the United States was substituted as the third-party defendant in place of Dr. Crabtree.  See Notice of Substitution of United States As Defendant filed on October 30, 2003 herein.  Approximately two weeks after Dr. Crabtree's deposition concluded on April 14, 2005, Defendant agreed to dismiss the United States as a third-party defendant.   See Stipulation For Dismissal Without Prejudice As To All Claims Against Third-Party Defendant United States of America filed herein on April 26, 2005.

With the dismissal of Dr. Crabtree, other than the actions and/or omissions of Defendant, there is no evidence of other factors which could have brought about Plaintiff's injuries.

4.b.    Defendant's Breach of Duty Was a Proximate Cause of Plaintiff's Injury in That a Reasonable Person in the Plaintiff's Position Would Not Have Consented to the Treatment That Led to the Injuries Had She Been Properly Informed

Because the Hawai'i courts have adopted the patient oriented standard, Defendant was required to disclose "...what a reasonable patient needs to hear from his or her physician in order to make an informed and intelligent

20

decision regarding treatment. ...". <u>Carr</u>, <u>supra</u>, 79 Hawai'i at 480, 484-485. The

<u>Carr</u> decision places emphasis on the "...patient's right of self-determination and

affixes the focus of the inquiry regarding the standard of disclosure on the

motivating force and purpose of the doctrine of informed consent..." <u>Id</u>. at p. 485.

The <u>Carr</u> court found,

> Moreover, not only should the patient's decision remain
> at the forefront when assessing the physician's disclosure
> to his or her patient in each case, but we also believe that
> ... what the medical community believes the patient
> needs to hear in order for the patient to make an
> informed decision is insufficient, without more, to
> resolve the question of what an individual patient
> reasonably needs to hear in order for that patient to make
> an informed and intelligent choice regarding the
> proposed medical treatment.

To support her claims for negligent informed consent, Plaintiff

testified:

> A.    Well, yes.  You'd asked me if I would have had the
>        surgeries if I had been told I would lose breast
>        tissue, and I would have -- if I'd known how much.
>        I mean, I would never have done this if I thought
>        things were going to go this bad.

*        *        *

> A.    ... I just -- honestly, I can say that I don't know if I
>        would have had the surgery if I was going to lose
>        some breast tissue.  I know that there's no way,
>        shape or form in my mind that if I knew I was
>        going to go through this, that if he could tell me,

21

you know, this is the worst case scenario that you
could go through, if I would have done it, no.  I
would never have had the surgery if I knew that
this was the worst case that I could have gone
through.

Q.    So what is it that you expected him to tell you
about the worst case scenario that you think would
have led you to decide not to have the procedure?

A.    I think he should have told me that, look, you can
end up with huge black spots on your breasts that
people have to cut off, that you could end up
completely losing half of your breast or
three-quarters of your breast or -- you know, there
was never any mention of losing any part of a
breast.  There was mention of loss of skin, loss of
nipple area, and I could handle that.  There is no
way I could expect any woman to handle having to
lose full parts of her breast.

<u>See</u> Exhibit C at pp. 93-94.

Based on Plaintiff's testimony, it is clear that had Plaintiff been
properly informed, she would not have consented to the surgery.

        5.    <u>There Is No Other Superseding Cause of Plaintiff's Injury</u>

Although Defendant hinted in deposition that there may be a
superseding cause of Plaintiff's injuries, he failed to clearly pinpoint another
cause:

22

Q.    What do you think reasonably medically probably caused the unusual conditions we see in those photographs?

A     Her pre-existing conditions in regards to obesity and significant weight changes; her history of smoking; and what may or may not have happened between the last time I saw her on the 10th and the 25th.

Q     Anything else?

A     Again, <u>I suppose anything is possible</u>.  Those are the things that come to mind at this point.

<u>See</u> Exhibit B at pp. 80-81 (emphasis added).

Defendant clearly states that obesity and a history of smoking are factors which caused Plaintiff's injuries.  His testimony, "I suppose anything is possible" is highly speculative and should be disregarded by the Court.  It is axiomatic that the test for admissibility is what is <u>probable</u>, not merely possible.  Thus, Defendant's testimony as to the probable causes of Plaintiff's injuries demonstrate the existence of factual issues concerning proximate causation such that summary judgment should be denied on this issue.

Such testimony, taken in the light most favorable to Plaintiff shows it is probable that, except for Plaintiff's obesity and smoking history (combined, of

course, with Defendant's failure to disclose those risks to Plaintiff), there were no other <u>probable</u> proximate or superseding causes of her injuries.

V.    <u>CONCLUSION</u>

When all the evidence described above is considered in the light most favorable to Plaintiff, it is clear that Defendant has failed to meet his burden of showing that there are no genuine issues for trial.  Defendant's very own testimony, along with the facts elicited in Plaintiff's deposition, more than satisfies Plaintiff's burden of demonstrating that genuine issues of fact exist.  These genuine issues of fact preclude summary judgment on the issue of informed consent.

DATED:  Honolulu, Hawai'i, May 4, 2007.


  /s/  JOHN S. EDMUNDS  
JOHN S. EDMUNDS
RONALD J. VERGA
JOY S. OMONAKA